# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN DARAGO, et al., | ) | CASE NO. 5:18-cv-2639 |
| | ) | |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | |
| LIVE NATION ENTERTAINMENT, INC. | ) | |
| et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

This personal injury action, before the Court on the basis of diversity, arises out of injuries sustained by plaintiff during an August 9, 2016 concert at an outdoor music venue in Cuyahoga Falls, Ohio. Now before the Court is the summary judgment motion of defendants. (Doc. No. 85 ["MSJ"].) Plaintiff opposes the motion (Doc. No. 89 ["Opp'n"]),[1] defendants have filed a reply (Doc. No. 94 ["Reply"]), and plaintiff has filed a sur-reply.[2] (Doc. No. 97 ["Sur-Reply"].) For the reasons that follow, summary judgment in favor of defendants is granted, and this case is dismissed.

---

[1] Plaintiff's original opposition brief was filed at Doc. No. 88. Plaintiff subsequently sought leave to file a corrected opposition brief *instanter*. (Doc. No. 89.) Plaintiff's motion for leave is granted.

[2] In response to a supplemental affidavit defendants filed contemporaneously with their reply (*see* Doc. No. 95), plaintiff sought leave to file a sur-reply. (Doc. No. 97.) The Court finds that the supplemental affidavit was offered in response to arguments raised in plaintiff's opposition brief and its filing, therefore, does not merit the filing of a sur-reply. *See Power Mktg. Direct, Inc. v. Wilburn Moy*, No. 2:08-cv-826, 2008 WL 4849289, at *2 (S.D. Ohio Nov. 6, 2008) (denying motion for leave to file sur-reply because plaintiff was "responding in the reply memorandum to the argument Defendants raised in the memorandum in opposition"). Further, plaintiff's proposed sur-reply goes beyond responding to the supplemental affidavit and offers additional arguments. In fact, plaintiff has even sought leave to exceed the page limitation set forth in the local rules for this filing. Nevertheless, in an abundance of caution, the Court grants the motion for leave and the Court has considered plaintiff's sur-reply (*see* Doc. No. 97 at page ID numbers 2256–77 and attachments) as part of the summary judgment briefing. All page numbers refer to the page ID number generated by the Court's electronic docketing system.

## I. BACKGROUND

### A.    History of Blossom

Blossom Music Center ("Blossom") is an outdoor amphitheater in Cuyahoga Falls, Ohio. Originally opened in 1968 as the summer home for the Cleveland Orchestra, today it also hosts a variety of bands and musical artists each year for a series of concerts. (Doc. No. 89, Ex. 1 (Blossom Wikipedia Page ["Bl. Wi. Pg."]) at 1608–09.) It is undisputed that the venue contains a covered pavilion with permanent seating, a lawn area with standing room capacity, a pit area immediately in front of the stage with additional standing room capacity, and a stage. A barricaded buffer zone separates the "pit" from the performance stage so as to prevent guests from approaching the stage and interfering with the performance. (Doc. No. 85-1 (Affidavit of Ronald Tynan, Jr. ["Tynan Aff."]) ¶¶ 14–15; *see* Doc. No. 52 (First Amended Complaint ["FAC"]) ¶¶ 31–34.) Blossom has the capacity to hold approximately 21,051 concert-goers. (*See* Bl. Wi. Pg. at 1608.)

In 1999, Blossom was operated by Cuyahoga Falls Concerts, Inc. ("CFCI"). (*See* Tynan Aff. ¶¶ 4–5.) On October 13, 1999, CFCI entered into payroll service agreements with Cast & Crew Productions Payroll, Inc. ("C&C") and BTL Payroll, Inc. ("BTL"). (*Id*., Exhibits A and B.) Relevant to the pending summary judgment motion, both agreements contained similar language that sets forth the parties' respective duties. The agreement with C&C, which covered employees subject to bargaining agreements, is representative and provided, in relevant part:

> 2. <u>Payroll Services</u>. For the convenience of and at the specific request of [CFCI], [CFCI] desires to have [C&C] become the designated "EMPLOYER OF RECORD" and provide payroll services on behalf of [CFCI] for all bargaining unit employees performing covered services . . . . Said payroll services provided by [C&C] on the above referenced production for the foregoing groups of covered employees shall be based

2

on the records of employment prepared by [CFCI] and provided to [C&C]. On the basis of such records supplied by [CFCI], [C&C] shall compute and pay all taxable wages, allowances, penalties, fees, fringe benefits and hourly pension, welfare or other Trust Fund payments called for under the applicable collective bargaining agreements. In addition, [C&C] shall compute and pay all required statutory payments and payroll taxes required with respect to the aforementioned employee payments. In addition, [C&C] shall issue Employee W-2's or 1099's for the above referenced production for the foregoing groups of covered employees which shall be based on the records of employment prepared by [CFCI] and provided to [C&C]. *Worker's Compensation Insurance for employees providing covered services will be provided to [CFCI] by [C&C]. Notwithstanding the foregoing, the parties understand and agree that day-to-day supervision and direction of employees in the performance of their covered services for the benefit of the particular production shall be the sole responsibility of [CFCI].*

(*Id.*, Exhibit A ¶ 2, emphasis added, footnote omitted.) CFCI is not a party to this litigation.

### B. Live Nation

Defendant Live Nation Worldwide, Inc. ("Live Nation") is a party defendant, and the path it took to becoming the operator of Blossom is both complex and relevant to the issues presented on summary judgment. (*See* Doc. No. 95 (Supplemental Affidavit of Ronald Tynan, Jr. ["Tynan Aff. Supp."]) ¶ 8.) "In 2006, Live Nation Entertainment, Inc. ("LNEI") acquired House of Blues Entertainment, Inc. ("HBEI"), which included its subsidiary, House of Blues Concerts, Inc. ("HBCI")." (*Id.* ¶ 6.) "Following the acquisition, in 2006 HBCI became a wholly owned subsidiary of HOB Entertainment, LLC ("HOB")." (*Id.* ¶ 7.) Later still in 2006, HOB became the wholly owned subsidiary of Live Nation. (*Id.* ¶ 8.) In 2009, CFCI merged into HBCI, which, as previously noted, is a subsidiary of HOB, a subsidiary of Live Nation. (*Id.* ¶ 10; *see id.* ¶ 8.) After CFCI's merger with HBCI, Live Nation assumed all responsibilities relative to the operations of Blossom as well as the aforementioned payroll agreements with C&C and BTL. (*Id.* ¶ 11; *see id.* ¶ 8.)

3

### C.      Plaintiff's Employment at Blossom

In 1982, plaintiff Kevin Darago ("Darago") graduated from the University of Akron with a degree in business administration and began a career in accounting. (Doc. No. 90 (Deposition of Kevin Darago ["Darago Dep."]) at 1669.) His most recent accounting position was with non-party Coleman Professional Services ("Coleman"). He worked full-time for Coleman, beginning in 2015 and ending sometime in September 2017. (*Id.* at 1670.) Owing to the injuries he sustained on August 9, 2016, Darago claims that he has been unable to continue to perform the duties of an accountant. (*Id.* at 1671.)

Darago's employment history also includes part-time work providing security for concerts at Blossom. In 2005, Darago responded to an advertisement in the newspaper providing for an "open call" for people to work at Blossom. (*Id.* at 1676.) He applied because he enjoyed music and thought it would be "something interesting to do." (*Id.*) He originally interviewed with either Brian Murphy ("Murphy") or Craig "Bear" Taylor ("Taylor") and was hired to work security for the concerts as a member of the crowd management team. (*Id.* at 1678.) Murphy was the supervisor of the pit area, and Murphy reported to Taylor, the Venue Security Supervisor for Blossom. Both men are still employed by Live Nation at Blossom. (*Id.* at 1678, 1690–92; Doc. No. 82-1 (Supplemental Deposition of Craig Taylor ["Taylor Dep. Supp."]) at 1081–82; Tynan Aff. ¶¶ 22, 23.) Darago was continuously employed at Blossom each summer between 2005 and 2016. (Darago Dep. at 1682.)

At the start of each concert season, Darago was required to "fill out additional paperwork." (*Id.* at 1692; *see* Tynan Aff. ¶ 11 ["every season Live Nation employees are required to submit a new employment application"].) On April 30, 2016, Darago submitted a

"Live Nation Entertainment Application for Employment—Part-Time/Seasonal" for the 2016 season. (Tynan Aff. ¶ 10, Ex. C.) According to the application, Darago, by applying for employment, agreed that "if [he] bec[a]me employed by Live Nation, [his] employment w[ould] be on an 'at will' basis." (*Id*., Ex. C at 1280.) The application further provided that he understood that "Live Nation may demote or discipline [him], or take other action with respect to [his] employment. . . ." (*Id*.) He also agreed "to comply with all of Live Nation's employment policies and code of conduct." (*Id*.) By signing the application, Darago further acknowledged:

> that I have read the statements listed above, that I understand them and that they will become a part of the terms and conditions of my employment if I become employed by Live Nation.

(*Id*.) He testified that he received a Live Nation handbook.[3] (Darago Dep. at 1694.)

When he first began his employment at Blossom, Darago worked various crowd management positions. Eventually he was assigned to work in the "pit." (*Id*. at 1680.) Darago testified that he enjoyed working in the pit because "it was interesting." (*Id*. at 1680.) At all times relevant to the present action, Murphy supervised the pit area and the crowd management employees assigned to work in it. (Taylor Dep. Supp. at 1095; *see* Darago Dep. at 1691.) Throughout [Darago's] employment at Blossom, Murphy, Taylor, and Ronald Tynan, Jr. ("Tynan"), also a Live Nation employee and the General Manager for Blossom, had "the authority to supervise, direct, and control the course and scope of Darago's employment at Blossom." (Tynan Aff. ¶¶ 2, 22, 23, 25.) Employees posted to the pit are charged with enforcing

---

[3] Darago also signed a Live Nation Consolidated Acknowledgement Form in which he verified he received a copy of the Live Nation Employee Handbook. (*Id*.)

the venue's rules and ensuring that guests do not approach the performance stage or otherwise wander into prohibited areas. (*Id.* ¶¶ 16–17; Darago Dep. at 1681.)

One of the rules the crowd management employees assigned to the pit were to enforce was Live Nation's prohibition against crowd surfing. (*See* Taylor Dep. Supp. at 1088; Darago Dep. at 1707; Tynan Aff. ¶ 30.) Crowd surfing involves lifting and passing a patron overhead by other patrons.[4] (Taylor Dep. Supp. at 1088–89; Darago Dep. at 1698–99; Doc. No. 91 (Deposition of John Tussey ["Tussey Dep."]) at 1850; Doc. No. 89, Ex. 11 (Affidavit of Kevin Darago ["Darago Aff."], beginning at 1650) ¶ 8; *see* FAC ¶ 38 (photograph).) According to Darago, the crowd surfer's goal is to make his or her way to the front of the barricade so that they can be as close as possible to the stage and the performers thereon. (Darago Dep. at 1699–1700.) The practice is inherently dangerous because the patron being passed forward can be dropped and because those supporting the patron, including security personnel, run the risk of being kicked or punched. (Darago Dep. at 1705, 1711; Tussey Dep. at 1852; *see* Doc. No. 92 (Deposition of Tony Robinson ["Robinson Dep."]) at 2014.)

Given the dangers associated with crowd surfing, Live Nation has maintained a policy that strictly prohibits crowd surfing, and this policy was in effect in 2016. (Tynan Aff. ¶ 18; Taylor Dep. Supp. at 1088; Tussey Dep. at 1864; *see* Darago Dep. at 1701, 1706.) Signage is posted around Blossom to alert patrons and guests of this policy, and an audio loop plays over the public announcement system advising that crowd surfing is prohibited. (Tynan Aff. ¶ 19 & Ex. D.) The sign and the announcement advise patrons that crowd surfers may be subject to

---

[4] In contrast to crowd surfing, "moshing" is a practice wherein concert-goers (usually men) dance in a violent manner by jumping up and down or in a circular motion intentionally colliding with each other. (Tussey Dep. at 1851; *see* FAC ¶ 38 (photograph).) It is undisputed that Darago's injuries were not the result of moshing. (Darago Dep. at 1695.)

ejection from the concert. (*See* Tynan Aff. ¶ 19, Ex. D at 1287; Darago Dep. at 1701–02.)

Notwithstanding the prohibition and the warnings, it is undisputed that crowd surfing does happen at some concerts, and crowd management personnel are tasked with ensuring that the surfer is ultimately returned safely to the ground. (Darago Dep. at 1705, 1710; Tussey Dep. at 1858, 1864; *see* Robinson Dep. at 2023.) Darago testified that he was instructed by another team member in a method to minimize the risk associated with crowd surfing. (Darago Dep. at 1705; Darago Aff. ¶ 13.) Specifically, "[t]wo pit personnel are required to receive a crowd surfer at the barricaded area, a first guy and a support guy." (Darago Aff. ¶ 11.) "[T]he 'first guy,' who actually receives the crowd surfer, must turn the surfer, so that the surfer's head arrives first, then passes to a 'support guy,' who is behind the first guy; the support guy then assists the crowd surfer down to the floor." (*Id.* ¶ 12.) The key is for the first person to handle the surfer in a way that insures that the patron's feet are facing away from the stage, so that as she is passed forward there will be less of a risk that she will kick someone. (Darago Dep. at 1705; Tussey Dep. at 1868–69.)

When a crowd management team member sees someone crowd surfing, he is supposed to permit the patron one "trip" to the front of the barricade and then advise the patron that if he or she is caught crowd surfing again, they will be ejected. (Taylor Dep. Supp. at 1091–92.) While crowd management team members do not have the authority to eject a patron, supervisors do. A security employee who wished to eject a patron for crowd surfing was to first submit the request to the pit supervisor. (Darago Dep. at 1697–98; Tynan Aff. ¶¶ 21, 60.)

### D.    The August 9, 2016 Concert and the Accident

The band blink-182 was the headliner for the concert at Blossom on August 9, 2016. (Tynan Aff. ¶ 35; Darago Aff. ¶ 6; Doc. No. 85-7 (Affidavit of Michael Sullivan ["Sullivan Aff."]) ¶ 4.) The group is composed of performing artists: defendants Mark Hoppus, Travis Barker, and Matt Skiba. Defendant Bring the Awesome, Inc. ("BTAI") is a California corporation and the legal entity under which blink-182 tours (the touring company and the band members are subsequently referred to collectively as "blink-182 defendants"). (*See* Darago Dep. at 1751; Doc. No. 85-8 (Affidavit of Mark Hoppus ["Hoppus Aff."]) ¶ 4; FAC ¶¶ 5, 18, 20.) The group is an American rock band known for its high energy performances (*see* FAC ¶ 19), and there is no dispute that patrons at the band's concerts have been known to crowd surf. (Robinson Dep. at 2003, 2015, 2022, 2026.) Because band members had discovered from earlier concerts the dangers associated with crowd surfing and similar behavior, the band prohibits crowd surfing and related activities during its performances. (*Id*. at 2035–36.) This prohibition appears in the band's written rider that is incorporated into its contract with each venue. (Robinson Dep., Ex. 3 at 2055–60; *see* Tynan Aff. ¶ 36 & Ex. E.)

BTAI hired NPB Companies ("NPB") to provide security for its 2016 tour. (Sullivan Aff. ¶ 8.) Tony Robinson ("Robinson"), an agent for and employee of NPB, was assigned to serve as venue security director for the band. (*Id*. ¶ 9.) (Robinson Dep. at 1985–86, 1994–95.) Robinson is not a party to this litigation.

Robinson testified that he received his training from NPB, and, at all times relevant to the present action, he was employed by NPB. (*Id*. at 1991; *see* Sullivan Aff. ¶ 10.) Because each venue had its own security personnel, Robinson explained that his focus was the safety of his

client-band/musical artist and crew. (Robinson Dep. at 1996; *see* Tynan Aff. ¶¶ 28, 32.) It was the responsibility of the venue's security staff to ensure that its employees and concert patrons remain safe during the performance. (Tynan Aff. ¶¶ 28, 32; Robinson Dep. at 2007.)

Prior to each show at Blossom, Live Nation management will participate in a meeting with representatives from the band or musical artist to discuss all production matters related to the evening's event. (Tynan Aff. ¶ 33.) The purpose of the meeting is to coordinate efforts between Live Nation's operational staff and those responsible for the performing band or artist. (*Id.* ¶ 34; *see* Robinson Dep. at 2002.) On August 9, 2016, Live Nation management, including Taylor, met with Robinson and other touring personnel to discuss the production for the concert that evening. (Tynan Aff. ¶ 39.)[5] Darago was not present at the meeting. (Darago Dep. at 1687, 1727.) While at no point during the meeting did Robinson, or anyone else, request that Blossom permit crowd surfing at the concert, Robinson advised those in attendance that it was possible that some patrons would crowd surf and that security should "[b]e aware of it." (Tynan Aff. ¶ 40; Robinson Dep. at 2015–16.)

Following the meeting with Robinson and others associated with the band, Taylor met with his crowd management staff and briefed them on what to expect during the event. Robinson did not attend the meeting. Nor did Darago, as he was coming from his accounting job and arrived late to Blossom. (Darago Dep. at 1713–14.) Consistent with Robinson's warning, Taylor advised those in attendance to "[b]e aware of possible crowd surfing[.]" (Tussey Dep. at 1866, 1877.) When Darago arrived at Blossom, he reported directly to the pit where his co-worker, John Tussey ("Tussey"), conveyed to him the warning about possible crowd surfers. (Darago

---

[5] Tynan, Live Nation employee and General Manager for Blossom, was also at the meeting. (Tynan Aff. ¶¶ 2, 39.)

9

Dep. at 1714.)

What happened next is a subject of dispute. Darago testified that immediately thereafter Robinson approached Darago, Tussey, and a few other crowd management team members stationed in the pit. Robinson confirmed that there would be crowd surfing that evening, and they were to "let the kids have fun." (*Id.* at 1715, 1720; Darago Aff. ¶¶ 7, 9.) At that point, Darago advised Robinson that crowd surfing is not permitted at Blossom, to which Darago submits Robinson responded "Well, it is tonight. We'll allow crowd surfing." (Darago Dep. at 1720; *see* Darago Aff. ¶ 9.) Robinson denies making these comments and testified that he never instructed any Blossom crowd security member to permit surfing or had the authority to do so. (Robinson Dep. at 2016, 2017.)

Nevertheless, it is undisputed that the opening act performed without incident. As soon as blink-182 took the stage, however, the crowd became loud. (Darago Dep. at 1716–17.) After the band played approximately four or five songs, some unidentified band member said, "Come on, let's get this thing started[,]" which, according to Darago, had the effect of "whip[ping]" up the crowd. (*Id.* at 1717; Tussey Dep. at 1886–87.) There had been a couple of crowd surfers before the comment, but Darago reported that, after the band member's comment, crowd management was very busy with patrons who were crowd surfing. (Darago Dep. at 1717; Darago Aff. ¶ 16; *see* Tussey Dep. at 1887.)

Darago served as the "support guy," while a second unidentified co-worker served as the "first guy." (Darago Aff. ¶ 15.)[6] Darago remembered one female patron in particular who surfed

---

[6] Darago testified that, immediately before the concert started, he instructed the "first guy" in the method he had learned to assist crowd surfers because it was the first guy's first day. (Darago Aff. ¶ 15.)

her way to the front of the barricade multiple times. After the third time Darago helped her to the ground, Darago told Tussey that they need to get rid of her, noting that he (Darago) had helped her crowd surf three times and Tussey had helped her "a bunch of times." (Darago Dep. at 1718.) According to Darago, Robinson was walking by at that moment, overheard his comment to Tussey, tapped Darago on the shoulder, and instructed the pair to let the female patron continue to crowd surf. (*Id.*; *see* Tussey Dep. at 1896.) Again, Robinson denies making such a statement and testified that he was without authority to require a venue's security team to permit crowd surfing. (Robinson Dep. at 2017, 2018–19, 2020.)

The last time Darago received the female surfer, her legs flailed and she kicked him in the face, injuring him. (Darago Dep. at 1718; Darago Aff. ¶ 18.) Darago testified that the "first guy" who was helping him failed to turn the female surfer around, and she arrived feet first at the barricade. (Darago Dep. at 1762; Darago Aff. ¶ 17.) For purposes of summary judgment, it is undisputed that Darago lost the vision in his left eye and has suffered a reduction in vision in his right. As a result of his injuries, he lost his full-time accounting job and has been unable to successfully return to part-time security work at Blossom.

### E.    Workers' Compensation Claim and Litigation

Following the incident, Darago filed for workers' compensation benefits. Darago's claim identified "C and C Wd Studio Productions LLC" as his employer. (Tynan Aff. ¶ 64 & Ex. F.) According to public records filed with the State of California, Secretary of State, "C and C Wd Studio Productions LLC," now dissolved, was an affiliate of C&C, one of the two payroll companies engaged by CFCI. (Doc. No. 85-11.) At the time of the accident, Darago's employer of record was BTL, as per the payroll agreement with BTL. (Tynan Aff. ¶ 66; *see id.* ¶ 65 & Ex.

B.) However, for purposes of workers compensation, the polices of C&C and BTL were combined under one policy. (*Id.* ¶ 66 & Ex. G ("Employer/MCO look-up").) Darago ultimately received benefits in the form of a lump sum payment of $110,000.00 for his injuries. (Darago Dep. at 1733; *see* Tynan Aff. ¶ 67.)

On July 17, 2018, Darago brought suit in state court against Live Nation (improperly named Live Nation Entertainment Inc.), BTAI, the individual members of blink-182, and various other named and unnamed entities that have since been dismissed or are otherwise no longer parties to this litigation. (*See generally* FAC.) Darago also named Ohio Bureau of Workers' Compensation ("BWC") as a party-plaintiff, citing BWC's asserted subrogated interest in a right of reimbursement. (*Id.* ¶ 73; *see generally id.*) On November 15, 2018, the action was removed to federal court. (*See* Doc. No. 1 (Notice of Removal).) The amended complaint raises claims for negligence; negligent hiring, training, and supervision; vicarious liability; and declaratory judgment.[7] (FAC at 590.)

By the present motion, defendants seek summary dismissal of all claims. As an initial matter, Live Nation asserts that it is entitled to immunity under Ohio Rev. Code § 4123.74. All defendants further posit that their actions were not the proximate cause of Darago's injuries and that they are entitled to a variety of affirmative defenses that serve as a complete bar to recovery for Darago.

---

[7] The claim for declaratory judgment seeks a "declaration determining the rights and obligations of [Darago] and [] BWC regarding the benefits conferred for and on behalf of [Darago], including coverage under [Ohio Revised Code] Chapter 4123." (FAC ¶ 74.)

## II. STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v.*

13

*Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 487 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); s*ee also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

### III. Discussion

#### A.      Workers' Compensation Immunity

Live Nation argues that, as Darago's employer, it is immune from all claims under Ohio Rev. Code § 4123.74 "by virtue of the fact Darago applied for and received workers' compensation benefits." (MSJ at 1228.) Darago insists that immunity is improper at this stage in

14

the proceedings because there are questions of fact as to who employed Darago and whether Live Nation paid workers' compensation premiums on his behalf.

"[C]laims arising from injuries sustained in the course of employment are typically addressed exclusively by Ohio's Workers' Compensation statutes." *Thomas v. PSC Metals, Inc.*, 143 N.E.3d 1117, 1122 (Ohio 2018). Section 4123.74 "gives employers 'who comply with [Ohio's workers' compensation statutes]' immunity 'for any injury, or occupational disease, or bodily condition, received or contracted by any employee in the course of or arising out of his employment." *Id.* (quoting Ohio Rev. Code § 4123.74). The statutory grant of immunity acts

> as a balance of mutual compromise between the interests of the employer and the employee whereby employees relinquish their common law remedy and accept lower benefit levels coupled with the greater assurance of recovery and employers . . . are protected from liability for negligence.

*Id.* (quoting *Maynard v. H.A.M. Landscaping, Inc.*, 849 N.E.2d 77, ¶ 12 (Ohio Ct. App. 2006) (further citation omitted)).

To be entitled to statutory immunity under § 4123.74, a defendant must establish the following: (1) that it was the injured worker's employer, and (2) that it paid workers' compensation premiums on the injured worker's behalf. *See id.* "The question whether a person is an employer for the purposes of workers' compensation immunity turns upon the key factual determination of who had the right to control the manner and means of the person's work." *Below v. Dollar Gen. Corp.*, 840 N.E.2d 215, 218 (Ohio Ct. App. 2005) (citing *Bostic v. Connor*, 524 N.E.2d 881, ¶ 1 syllabus (Ohio 1988)); *see Daniels v. MacGregor Co.*, 206 N.E.2d 554, 556 (Ohio 1965) (similar). Under the second prong, an entity may pay the workers' compensation premiums "either directly or indirectly to qualify for immunity under [§] 4123.74." *Thomas*, 143 N.E.3d at 1123 (citing, among authority, *Foran v. Fisher Foods, Inc.*, 478 N.E.2d 998 (Ohio

1985)).

### 1.    *Live Nation is Darago's Employer*

Darago insists that there is "confusion" as to whether Live Nation employed him, citing the fact that the employer of record listed on his workers compensation claim was C and C Wd Studio Productions LLC, a subsidiary of C&C. (Opp'n at 1576.) But this fact does not end the inquiry because "for the purposes of workers' compensation immunity an employee may have dual employment status." *Below*, 840 N.E.2d at 699; *see Wolf v. Big Lots Stores, Inc.*, No. 07AP-511, 2008 WL 1759073, at *2 (Ohio Ct. App. Apr. 17, 2008) (noting that "[t]he Supreme Court of Ohio has clearly stated that, for purposes of [§] 4123.74, workers' compensation immunity, an individual may under certain circumstances be considered the employee of more than one employer qualifying for immunity") (citing, among authority, *Stanadyne, Inc. v. Indus. Comm'n of Ohio*, 466 N.E.2d 171 (Ohio 1984)).

The concept of dual employment for purposes of workers' compensation immunity most often manifests itself in scenarios involving temporary hiring agencies and, for this reason, it is referred to as the "loaned servant" doctrine. *See Jones v. Shaffer Trucking Co.*, No. 2:05-cv-1020, 2006 WL 8442724, at *5 (S.D. Ohio July 21, 2006). "If an employer 'lends' its employee to a customer, and that customer 'controls the manner or means of performing the [employee's] work,' then that employee is an employee of the customer within the meaning of the Workers' Compensation Act and, thus, the customer cannot be liable for any injury the employee receives in the course of or arising out of his work for the customer." *Stinnett v. Halcore Grp., Inc.*, 847 N.E.2d 16, 19 (Ohio Ct. App. 2006).

In *Daniels, supra*, the plaintiff was hired by Manpower, a temporary employment agency, and was instructed by Manpower to work in a customer's facility. He was injured when he fell from a ladder while installing a light fixture in one of the customer's buildings. There was no dispute that the plaintiff performed his work at the customer's facility under the exclusive direction and supervision of the customer. *Daniels*, 206 N.E.2d at 555, syllabus. But it was also undisputed that Manpower retained "the exclusive right to hire and discharge its employees and to determine which of its employees are to be assigned to its customers. It also reserve[d] the right to remove and to reassign its employees from one customer to another even during the course of a workday." *Id*. Manpower also deducted "from its employees' wages the income and social security taxes and similar deductions, and no such deductions are to be made by its customers. Manpower, and not its customers, [paid] all workmen's compensation premiums and unemployment compensation payments for the protection of its employees." *Id*. An agreement between Manpower and its customer further provided that the customer would not employ Manpower's workers "'now or for a period of ninety days following the completion of work for the [customer].'" *Id*. (quoting contract). Nonetheless, the Supreme Court of Ohio upheld the trial court's grant of summary judgment to the customer on the basis of workers' compensation immunity concluding that "reasonable minds could conclude only that the right to control the manner and means of performing the work which plaintiff was doing when injured was in [the customer]." *Id*. at 558.

Applying the principles announced in *Daniels*, courts in Ohio have looked to several factors "[t]o determine the factual issue of who had the right to control the manner or means of doing the work," for purposes of the loaned servant doctrine and workers' compensation

immunity. *Below*, 840 N.E.2d at 220 (citing *Bostic*, 524 N.E.2d at 883). "These factors include, but are not limited to, who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools, and personnel used; who selects the routes; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts." *Id*. (citing *Bostic, supra*); *see, e.g., Crew v. Advics Mfg. Ohio, Inc*., No. CA2019-05-051, 2020 WL 526016, at *6 (Ohio Ct. App. Feb. 3, 2020) (Even though temporary employment agency was responsible for issuing paychecks, maintaining workers' compensation insurance, and retaining all employment documents, customer was employer where agreement with agency provided customer was responsible for day-to-day supervision of employee); *Thomas*, 143 N.E.3d at 1123 (customer was employer for § 4123.74 immunity where it trained, supervised, and provided all tools and equipment for employee, despite the fact that staffing agency provided workers' compensation insurance).

Strictly speaking, Darago cannot be considered the "loaned servant" of either BTL or C&C because he started in the employ of Live Nation and/or CFCI, the wholly owned subsidiary of Live Nation's subsidiary. *See Cottrill v. Thermo Electron N. Am., LLC*, No. 09CA34, 2010 WL 2010920, at *4 (Ohio Ct. App. May 17, 2010) (The "loaned servant" doctrine "necessarily presumes that the servant remains in the overall employ of the original employer.") (citing *Campbell v. Cent. Terminal Warehouse*, 383 N.E.2d 135, 137 (Ohio 1978)). But the inquiry remains the same: namely, who controlled the manner and means of Darago's day-to-day activities. *See id*. at *4; *see Daniels*, 206 N.E.2d at 558. The record demonstrates that Darago filled out a Live Nation employment application; he was interviewed and ultimately hired by Live Nation staff; he was subject to the rules and policies contained in Live Nation's employee

18

handbook; and he was under the direct control and supervision of Live Nation employees. Darago further acknowledged that only management employees working at Blossom—all Live Nation employees—could disciple or discharge him. (Darago Dep. at 1724–25; *see* Tynan Aff. ¶¶ 2, 23, 25; *see also* Tussey Dep. at 1910–11 [confirming that, as a crowd management team member at Blossom, he was employed by Live Nation].)

Moreover, Darago's employment with Live Nation did not change by virtue of the payroll service agreements with C&C and BTL. Even though C&C and BTL contractually agreed to pay wages and workers' compensation premiums for workers at Blossom, the contracts specifically provided that the "*day-to-day supervision and direction of employees in the performance of their covered services for the benefit of the particular protection shall be the sole responsibility of Producer*." (Tynan Aff, Ex. A at 1270.)[8] Further, while the "producer" who entered into the payroll agreements was CFIC, Live Nation has offered uncontroverted evidence that it assumed responsibility for these agreements after CFCI merged with HBCI, a wholly owned subsidiary of Live Nation. (Tynan Aff. Supp. ¶ 11.) It is clear that, aside from providing payroll services and other administrative functions, neither BTL nor C&C played any role in Darago's employment at Blossom.[9] (*See* Tynan Aff. ¶¶ 69–71.)

Darago fires back by noting that the "so-called application" he filed out in 2017 was for

---

[8] In his deposition, Darago testified that C&C was the company that handled his workers' compensation claim and that he received his W-2's from BTL. (Darago Dep. at 1743.) He conceded that C&C did not control his day-to-day activities while he worked at Blossom, and he had no idea who C and C Wd Studio Productions, LLC was, nor had he ever been to their office. (*Id.* at 1747, 1763.) He also candidly admitted that he did not know the relationship between C&C, BTL, and Live Nation. (*Id.* at 1763.)

[9] Courts have repeatedly emphasized that, for purposes of § 4123.74 immunity, the identity of the employer "'depends on who had the right to manage the manner or means of day-to-day control over the employee, not who was responsible for administrative human resources matters.'" *Crew*, 2020 WL 526016, at *5 (quoting *Cowan v. Interdyne Corp.*, No. 1-12-16, 2013 WL 684653, at *3 (Ohio Ct. App. Feb. 25, 2013)); *Cottrill*, 2010 WL 2010920, at *5 (noting that "the focus should not be on the administrative concerns or structure of business relationships, but rather on who was controlling the actual labor that resulted in an alleged tort").

Live Nation Entertainment and not for Live Nation Worldwide. (Opp'n at 1576.) He further observes that he previously received paychecks from CFCI and that C&C and BTL eventually became limited liability corporations. Given the number of entities mentioned in the record and the complexity of the relationships between them, Darago suggests that he "could have been employed by Musical Arts Association (Blossom Music Festival), CFCI, Case & Crew, Inc., and BTL, Inc., initially, and by Cast & Crew, LLC, BTL, LLC, subsequently, HBCI or Live Nation Entertainment."[10] (*Id.* at 1572.) According to Darago, this lingering confusion has created factual disputes as to the identity of his true employer that render summary judgment on this issue inappropriate.

At its essence, Darago's argument is that the complexity of the corporate relationships between Live Nation and its subsidiaries and the companies that provide payroll services results in a question of fact. But the fact that the relationships are complicated, or that Darago did not personally understand or appreciate the legal significance of these relationships or which entity actually employed him, does not create genuine issues of material fact.[11] Ohio law disregards corporate structure in workers compensation immunity analysis and focuses on who controlled the injured employee's day-to-day activities. While plaintiff testified that he had no idea who

---

[10] Darago gratuitously added to the laundry list the Musical Arts Association, which is the parent organization of the Cleveland Orchestra and the owner of the physical building and facility known as Blossom. (Bl. Wi. Pg.) While several Live Nation employees testified that they were employed *at Blossom*, none suggested that they were employed by the Musical Arts Association or the Cleveland Orchestra, and there is absolutely no evidence that Darago was ever employed by or had anything to do with either entity.

[11] Darago's argument that the employment application was actually prepared by LNEI, a wholly owned subsidiary of Live Nation, is of no legal significance. The Consolidated Acknowledgment Form, filled out by Darago at the time he applied in 2016, specifically provide that "[t]his document serves as acknowledgement of Live Nation Entertainment, Inc's (***and all of its affiliates and subsidiary employers, including but not limited to Live Nation Worldwide, Inc.***, all subsidiaries and affiliates of House of Blues Entertainment, Inc., and Ticketmaster LLC (collectively "Live Nation") Code of Business Conduct and Ethics, Employee Handbook, the Proprietary Information Agreement, Arbitration Agreement and Acknowledgment of Receipt of Harassment/Sexual Harassment Policy." (Darago Dep., Ex. 4 at 1801, emphasis added.)

employed him (*see, e.g.,* Darago Dep. at 1737), the undisputed facts—including those conceded by Darago in his deposition—demonstrate that Live Nation controlled his work.

Darago's citation to the unreported decision of *Hornyak v. Res. Alloys, L.L.C.*, No. 104302, 2016 WL 7626325 (Ohio Ct. App. Dec. 29, 2016) does not change the analysis or the result. In *Hornyak*, the Ohio Eighth District Court of Appeals denied summary judgment to the customer-employer under the loaned servant doctrine because "[i]t is not apparent that [the customer-employer] was the employer who in fact contracted with the temporary agency and paid the workers' compensation premiums." *Id.* at *5. No Ohio court since *Hornyak* has required the employer-customer of a staffing agency to have a written agreement as to the payment of workers' compensation premiums in order to qualify for immunity under § 4123.74. More importantly, in *Root v. Stahl Scott Fetzer Co.*, 88 N.E.3d 980, 993 (Ohio Ct. App. 2017), the Eighth District subsequently reaffirmed that the control test "controls" the determination as to whether an affiliated company was entitled to workers' compensation immunity. There, the court denied workers' compensation immunity to a sister corporation where there was "no evidence that [the sister corporation] had any direct control over" the injured worker and there was no evidence that the sister company contributed to the employee's workers compensation premiums. *Id.* at 993–94.

By contrast, in the present case, the payroll services agreements specifically provided for the payment of workers' compensation premiums on behalf of CFCI employees, and it is undisputed that Live Nation assumed the responsibilities under those agreements after CFCI merged with HBCI. (*See* Tynan Aff. Supp. ¶ 11. ) *See, e.g., Crew*, 2020 WL 526016, at *5–6 (applying the "control" test and distinguishing *Hornyak* on ground that the employer-customer

both controlled the employee and there was a contract covering the payment of workers' compensation premiums); *Thomas*, 143 N.E.3d at 1124 (similar). Because there are no genuine issues of material fact as to whether Live Nation controlled Darago's day-to-day activities at Blossom, Live Nation has met the first prong of the workers' compensation immunity test.

2.      *Live Nation Paid Workers' Compensation Premiums for Darago*

Turning to the second prong, Darago argues that, "[o]ther than [Tynan's] self-serving statement, [Live Nation] has not provided any evidence, document or otherwise, that it paid workers' compensation premiums, let alone paid the premiums on behalf of Darago." (Opp'n at 1463.) Darago presumably refers to Tynan's original affidavit wherein he avers that "it is my *understanding* that Live Nation paid a premium and/or additional monies for Workers' Compensation coverage." (Tynan Aff. ¶ 9, emphasis added.) "Parties must demonstrate that their summary judgment affidavits are made on personal knowledge." *Giles v. Univ. of Toledo*, 241 F.R.D. 466, 469 (N.D. Ohio 2007). "Affidavits based on mere 'information and belief,' as opposed to facts the affiant *knows* to be true, are not proper." *Id.* (emphasis in original). Courts have found that averments that convey the affiant's "understanding" as to certain facts are tantamount to averments premised on "information and belief" and are insufficient to support summary judgment under Rule 56. *See, e.g., id.* at 470; *Star Ins. Co. v. Hazardous Elimination Corp.*, No. 05-4762, 2007 WL 316569, at *13 (E.D.N.Y. Jan. 30, 2007) (affidavit based on affiant's "understanding," without specifying any basis for the understanding, could not be considered on summary judgment). The Court agrees that such a statement would be insufficient to satisfy the second prong.

But there are other ways to satisfy the second prong. "An employer can show compliance with Ohio's workers' compensation statutes by obtaining certification from the Industrial Commission or by showing that the injured employee received workers' compensation benefits." *Thomas*, 143 N.E.3d at 1123. Darago does not deny that he received workers' compensation benefits but argues that it is not enough to demonstrate that *someone* paid the workers' compensation premiums. The court rejected a similar argument in *Thomas*. There, the court held that it did not matter whether the customer-employer or the temporary agency paid the premiums so long as someone paid them. The court found that it was undisputed that the employee received workers' compensation benefits and that the employer had entered into an agreement whereby the staffing agency was to pay the premiums. *Id*. at 1124; *see Crew*, 2020 WL 526016, at *6 (customer-employer satisfied second prong of immunity test where the employee did not deny that he received workers' compensation and the agreement provided that the staffing agency would be responsible for providing workers' compensation for all assigned employees). It is undisputed that Darago received workers' compensation benefits, and the payroll agreements provided that BTL and C&C would ensure that all employees of CFCI would be covered by workers' compensation insurance. It is further undisputed that Live Nation assumed all duties and responsibilities under the agreements after the merger of CFCI. This evidence, alone, is sufficient under Ohio law.

However, Live Nation has also submitted Tynan's supplemental affidavit in support. Appended to this supplemental affidavit is an invoice that verifies that Live Nation was billed for Darago's workers' compensation premiums. (Tynan Aff. Supp. ¶ 16; Doc. No. 95 (BTL Employee Fringe Report) at 2129.) Citing the invoice issued by BTL, Tynan avers that "As

23

General Manager of Blossom and Live Nation Worldwide, Inc. employee, . . . I can confirm that Live Nation Worldwide, Inc. paid the invoice and therefore paid Workers' Compensation premiums on Darago's behalf at the time his injury occurred." (Tynan Aff. Supp. ¶ 17.) This affidavit evidence, properly supported by Tynan's personal knowledge as General Manager of Blossom and Live Nation employee, also satisfies the second prong of the workers' compensation immunity test.

Reasonable minds could conclude only that Live Nation was Darago's employer and that it paid workers' compensation premiums on his behalf. Accordingly, the Court determines that, as a matter of law, Live Nation is entitled to complete immunity under Ohio Rev. Code § 4123.74. Live Nation's motion for summary judgment as to all claims asserted against it is granted.

### B. Negligence as to blink-182 Defendants

#### 1. *Premises Liability*

In Darago's negligence claim (Count 1), he alleges generally that defendants "collectively owed a duty of ordinary care to" him, and that this duty required defendants to "maintain a safe work area and environment" for him. (FAC ¶¶ 47, 48.) blink-182 defendants argue that they owed no duty of care to Darago, as they were neither the owner nor occupier of the premises and that, in any event, they are absolved of any liability under the doctrines of assumption of the risk and open and obvious danger.

A landowner owes a duty of care to its invitees. *See generally Simmers v. Bentley Constr. Co.*, 597 N.E.2d 504 (Ohio 1992). This duty to keep a premises safe only arises when the landowner was in possession and control of the premises at the time in question. *Simpson v. Big*

24

*Bear Stores* Co., 652 N.E.2d 702, 704 (Ohio 1995). "The test to determine whether the owner or occupier had control is, generally, whether they had the power and right to admit people to (or exclude) from the premises." *Wolf v. Bison Baseball, Inc.*, No. 09AP-905, 2010 WL 1254597, at *2 (Ohio Ct. App. Mar. 31, 2010) (citing *Simpson*, 652 N.E.2d at 704).

The Court observes that the undisputed record establishes that blink-182 defendants had no power or right to admit (or exclude) people from the premises. (*See* Sullivan Aff. ¶ 5; Hoppus Aff. ¶¶ 7, 21; Robinson Dep. at 2000, 2019.) For this reason alone, blink-182 defendants cannot be held liable under a theory of premises liability.

## 2.     *Negligent Hiring*

Count Two alleges a claim of negligent hiring. (FAC ¶¶  54–63.) Relevant to blink-182 defendants, Darago alleges that defendants permitted unsupervised and untrained managers and employees to permit crowd surfing, despite the inherent dangers associated with such an activity. (*Id.* ¶¶ 59–60.) Ohio law recognizes the tort of negligent hiring. *Byrd v. Faber*, 565 N.E.2d 584, 589–90 (Ohio 1991). It is Darago's position that BTAI was negligent in its hiring of Robinson, and that Robinson's negligence, in turn, caused his injuries. To establish a negligent hiring claim, the plaintiff must demonstrate: (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of the plaintiff's injuries. *Plotner v. Swanton Local. Bd. of Educ.*, 85 F. Supp. 2d 747, 755 (N.D. Ohio 2000) (citing *Staten v. Ohio Exterminating Co., Inc.*, 704 N.E.2d 621, 623 (Ohio 1997)). blink-182 defendants insist that the record fails to support any of these elements.

Beginning with the employment relationship, blink-182 defendants argue that, at best, Robinson was an independent contractor. Generally, an employer can be liable for the conduct of its employees through *respondeat superior*, but a defendant is not liable for negligent acts of an independent contractor. *Pusey v. Bator*, 762 N.E.2d 968, 972 (Ohio 2002). The key determination regarding whether an individual is an employee or an independent contractor is whether the defendant had the right to control the individual's everyday tasks. *See Herndon v. Torres*, 791 F. App'x 547, 552 (6th Cir. 2019). In the absence of material factual disputes, this inquiry can be resolved as a matter of law. *Id.*

The record evidence demonstrates that Robinson was at all relevant times an employee of NPB. BTAI hired NPB to handle personal security for the band, and NPB assigned its employee, Tony Robinson, to oversee that security. (Doc. No. 85-6 (Affidavit of Perrin Beattle ["Beattle Aff."]) ¶¶ 7, 9.) Robinson testified that he was trained by NPB, and that at all times relevant to the present lawsuit, he was an agent of NPB and remained employed by NPB. (Robinson Dep. at 1985–90, 1991, 2000; Beattle Aff. ¶¶ 12, 13.) He further testified that, while performing artists can make suggestions regarding the show and the security provided during the show, they do not have the authority to direct his work. (Robinson Dep. at 1997–98, 1999.) Darago offers no contrary record evidence demonstrating an employment relationship between blink-182 defendants and Robinson.

Nonetheless, Darago argues that he can still hold blink-182 defendants liable for Robinson's actions upon an agency theory. Specifically, Darago suggests that blink-182 defendants held Robinson out as having apparent authority to act on their behalf. (Opp'n at 1595.) He argues that blink-182 defendants held out Robinson out as their "security agent" by

permitting him to attend the pre-concert meeting with Live Nation management to discuss security and points to the security rider Robinson provided to each venue on behalf of the band. (*Id*. at 1598.) But Darago did not attend the pre-concert meeting and he testified that he had not seen the band's security rider prior to the accident. (Darago Dep. at 1727, 1732.) Moreover, there is no evidence in the record that Darago ever interacted with BTAI or the individual band members. Without some evidence that blink-182 defendants represented to Darago that Robinson was their agent or that blink-182 defendants knowingly permitted Robinson to hold himself out as their agent, Darago cannot establish a relationship via apparent agency. *See Mortg. Elec. Registration Sys., Inc. v. Mosley*, No. 93170, 2010 WL 2541245, at *10 (Ohio Ct. App. July 26, 2010).

Further, Darago cannot demonstrate that Robinson was negligent. Darago insists that Robinson personally instructed him to permit crowd surfing—and, in particular, instructed him to let the female patron who ultimately kicked him in the face continue to crowd surf. In his deposition, Darago testified that when Robinson first instructed him to permit crowd surfing and to "let the kids have fun[,]" he informed Robinson that such a practice would not be permitted by the venue's normal policy, but Robinson responded "Well, it is tonight. We'll allow crowd surfing." (Darago Dep. at 1720.) He testified that, later, when he wanted to eject the female patron, Robinson said "No, let her go." (*Id*. at 1718.) Presumably these statements are offered both to establish that blink-182 defendants should have been aware that Robinson was holding himself out as the agent for the band, and to show that Robinson's conduct caused Darago's injuries. As previously noted, Robinson, who is not a party to this litigation (nor is his employer, NPB), denied making any such statements.

"It is well established that a court may not consider hearsay when deciding a summary judgment motion." *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012); *see Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (citing *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988) (stating that "[i]t is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment")). Darago does not seriously contest that Robinson's statements are hearsay, nor does he point to any other evidence in the record that would demonstrate that Robinson is responsible for his injuries.

Instead, Darago argues that the statements are admissible, and therefore can be considered on summary judgment, under Fed. R. Evid. 803(3).[12] Pursuant to Rule 803(3), an exception to the rule against hearsay, a witness can testify as to "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)[.]" Fed. R. Evid. 803(3). The Sixth Circuit has further explained that "Rule 803(3) allows witnesses to recount hearsay statements (that is, statements offered to prove the truth of the statements' factual content) when the statement's original declarant is expressing his or her then-existing state of mind." *United States v. Kilpatrick*, 798 F.3d 365, 386 (6th Cir. 2015). Robinson's statements do not qualify under Rule 803(3), as they do not go to Robinson's then-existing statement of mind, nor can they be

---

[12] Darago also suggests that such statements would be not be considered hearsay under Fed. R. Evid. 801(d)(1) because they would qualify as prior inconsistent statements of a declarant. (Opp'n at 1598.) Darago is mistaken. These statements that were allegedly made at Blossom were not made under oath in a previous proceeding that conflict with Robinson's testimony that was subsequently offered in this matter. *See* Fed. R. Evid. 801(d)(1)(A); *see also Williams v. United Dairy Farmers*, 188 F.R.D. 266, 273 (S.D. Ohio 1999) ("In this case, the alleged statements of Freeman and Munyan were conveyed at the kitchen table of the Freeman home; and thus, because the statements were not made in a previous trial or hearing subject to the penalty of perjury, they do not qualify as non-hearsay under Rule 801(d)(1)(A).") They would also not qualify as prior consistent statements under Fed. R. Evid. 801(d)(1)(B)(i). While Darago claims Robinson instructed him to allow crowd surfing, Robinson testified, under oath, that he did not. (Robinson Dep. at 2016, 2017.)

considered statements about Robinson's emotional, sensory, or physical condition. They are simply alleged instructions given to Darago.[13] These statements are the only evidence Darago offers to support a finding that Robinson caused his injuries. Without some competent evidence, Darago is unable to establish that blink-182 defendants are responsible under a theory of *respondeat superior* for Robinson's actions.

### 3. Proximate Cause

blink-182 defendants also argue that they cannot be liable under any tort theory—including premises liability and negligent hiring—because they did not proximately cause Darago's injuries. "Ohio law requires a plaintiff alleging negligence to establish that a genuine issue of material fact exists as to the following elements: that the defendant owed a duty of care to the plaintiff, that the defendant breached that duty, and that the breach of duty was the cause in fact and proximate cause of injury to the plaintiff." *Petre v. Norfolk S. Ry. Co.*, 458 F. Supp. 2d 518, 527 (N.D. Ohio 2006) (citing *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 563 (6th Cir. 2006)). "Proximate cause is generally established where an original act is wrongful or negligent and, in a natural and continuous sequence, produces a result that would not have taken place without the act." *Id.* (citing *Strother v. Hutchinson*, 423 N.E.2d 467, 471 (Ohio 1981)); *see State Farm Mut. Auto. Ins. Co. v. VanHoessen*, 682 N.E.2d 1048, 1049 (Ohio Ct. App. 1996) ("Negligent conduct

---

[13] In support of his Rule 803(3) argument, Darago suggests that the statements "would be offered to show fear of not being employed by any employer as a security personnel if he did not allow crowd surfing, which was, in his mind, a dangerous activity and against Blossom's and Live Nation Worldwide's policy." (Opp'n at 1598.) Such a theory is pure speculation and not supported by the record. In fact, Robinson testified that he was not required to follow his client's instructions, and that if a band requested that crowd surfing be permitted, notwithstanding a policy prohibiting it at the venue, he would tell the band that they could not do it. (Robinson Dep. at 1998–99.)

is the proximate cause of an injury if the injury is the natural and probable cause of the conduct, i.e., if it is foreseeable.").

An injury may have more than one proximate cause. *See Murphy v. Carrolton Mfg. Co.*, 575 N.E.2d 828, 829 (Ohio 1991). "When an injury is the natural and probable consequence of negligent conduct, that the negligence of others unites with that negligence to cause injury does not relieve the original offender from liability." *VanHoessen*, 682 N.E.2d at 1049–50. But plaintiff's burden to demonstrate proximate cause "requires more than merely showing that the defendant caused a condition that provided the opportunity for other causal agencies to act." *Petre*, 458 F. Supp. 2d at 527. "Further, the issue of proximate cause is usually a question of fact, however, if the plaintiff's evidence on the issue requires mere speculation or conjecture to determine the cause of the resulting injury, the defendant is entitled to summary judgment." *Id*. (citations omitted).

It is undisputed that no member of the band, nor any individual associated with blink-182 or BTAI, ever instructed the patrons to crowd surf. (Darago Dep. at 1732; Hoppus Aff. ¶¶ 15–16, 18.) Darago testified, however, some unidentified member of the band said "Come on, let's get this thing started." (Darago Dep. at 1717.) According to Darago, this comment "whipped" up the crowd. (*Id*.) Notwithstanding the fact that BTAI had a policy against crowd surfing, Darago speculates that the purpose of the statement was to "try[] to get [the crowd] to go ahead and start

crowd surfing."[14] (*Id.*) At best, the ambiguous remark by some unknown band member demonstrates that blink-182 defendants animated the crowd and "caused a condition that provided the opportunity for other causal agencies to act."[15] *See Petre*, 458 F. Supp. 2d at 527. And neither this stray remark, nor Darago's speculation as to the motivation behind the remark and its responsibility for his resulting injuries, satisfies his burden to show proximate cause. *Id.*

Moreover, Darago's own testimony identifies the "causal agenc[y]" that acted and, in doing so, supplies an alternative proximate cause for his injuries. Specifically, Darago testified that the "first guy," a fellow crowd management employee who was helping him with the crowd surfers, failed to turn around the female patron who injured him and permitted her to crowd surf feet first, which made it possible for her to kick Darago in the face when Darago eventually helped her to the ground. (*Id.* at 1762–63; *see* Darago Aff. ¶¶ 17–18.) According to Darago, this employee's inadequate training on the proper technique for assisting crowd surfers—for which Darago conceded the band was not responsible—caused his injuries. (Darago Dep. at 1762–63; *see* Darago Aff. ¶¶ 17, 20 [Darago noting that he "did not expect or anticipate that [he] would be suddenly kicked by a crowd surfer, since the same crowd surfer was not kicking or flailing her feet when she arrived at the barricade on previous occasions"].)

Because Darago has failed to come forward with any evidence that, if believed, would

---

[14] Darago claims that his speculation is supported by the testimony of Tussey, who Darago suggests testified that, in his experience, "such announcements are designed to incite the crowd into a frenzy and are cues to begin moshing and crowd surfing." (Opp'n at 1604.) Such a statement misrepresents Tussey's testimony. In his deposition, Tussey explained that "[s]ometimes [performing artists] would say 'These guys [security personnel] aren't up here [meaning the pit] for nothing. Let's start passing bodies.'" (Tussey Dep. at 1865.) "They may say 'Come on, let's get this crowd going. You know, these guys aren't here for nothing.'" (*Id.*) Neither Darago, nor Tussey, testified that any band member mentioned crowed surfing or the passing up of bodies, and there is no evidence that any band member advised the patrons that the security personnel in the pit were there for the purpose of helping them to crowd surf.

[15] In fact, Darago testified that the crowd became loud immediately after blink-182 took the stage, even before the unidentified band member made the comment. (Darago Dep. at 1716–17.)

demonstrate that blink-182 defendants proximately caused his injuries, blink-182 defendants are entitled to summary judgment on the negligence claims asserted against them for this additional reason.[16]

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED, and all claims in the FAC asserted against defendants are DISMISSED. Further, because Darago may not recover damages on his negligence claims, and there is no basis upon which to find BWC has a right to reimbursement, the declaratory judgment claim asserted against BWC is also DISMISSED. This case is closed.

**IT IS SO ORDERED.**

Dated: August 16, 2021

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[16] Because the Court concludes that, as a matter of law, the negligence claims do not survive summary judgment on the merits, it need not consider blink-182 defendants' alternative arguments that they are entitled to dismissal under the doctrines of assumption of the risk and/or open and obvious dangers. Of course, the fact that Darago argues that the affirmative defense of open and obvious danger is not available to blink-182 defendants because they neither possessed nor controlled Blossom, only serves to underscore the fact that Darago cannot make out a premises liability claim against these defendants. *See Simpson*, 652 N.E.2d at 704 ("It is fundamental that to have a duty to keep premises safe for others one must be in possession and control of the premises."); *see also Martin v. Lambert*, 8 N.E.3d 1024, 1031 (Ohio Ct. App. 2014) (Under the common law of premises liability, possession, occupation, and control of the premises are all prerequisites to liability). Further, because Live Nation is entitled to complete immunity under Ohio Rev. Code § 4123.74, the Court need not consider whether it is liable for failing to properly train the unidentified "first guy," or whether it is entitled to any available affirmative defense.